UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Kwang Ho Lim, | ) | Case No. 04 B 28095 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Yong Myong, individually and for and on behalf of Keystone MFG., Inc., an Illinois Corporation, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 04 A 3838 |
| | ) | |
| Kwang Ho Lim, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Yong Myong asks this Court to find certain of Debtor Kwang Ho Lim's debts nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(4).

## JURISDICTION

This adversary proceeding arises under Title 11 as it concerns a cause of action created by Title 11, the dischargeability of Defendant Lim's debts.

## BACKGROUND FACTS

In March, 2002 Plaintiff Myong purchased from Debtor Lim 50% of the shares of Keystone Manufacturing, Inc.; Keystone manufactures dental supplies. Before the transaction in issue, Defendant Lim owned 60% of Keystone's shares; his wife, Monica Lim, owned 40% of Keystone's shares.

Plaintiff Myong agreed to pay $500,000 for 50% of Keystone's shares. He made a cash payment of $150,000 and agreed to pay the balance later.

Defendant Lim gave $100,000 of the stock sale proceeds to his wife as part of a divorce settlement; he kept the remaining $50,000. Plaintiff Myong testified that the sums paid for the stock were supposed to be used for business purposes. There was neither legal nor factual support for this

expectation. In fact, there was testimony that the divorce action was filed on the same day as the stock sale and that Plaintiff's lawyer negotiated the stock sale and divorce settlement with the attorneys representing both Defendant Lim and Monica Lim.

After the stock sale, Plaintiff Myong, on behalf of Keystone, arranged to move the company to Chicago. Plaintiff Myong executed the lease for the new premises, personally guaranteeing the lease payments. After Plaintiff left Keystone in July 2002, Defendant Lim executed a settlement agreement with the lessor under which the business was to make a payment of $21,200. Plaintiff Myong had no knowledge of this agreement. When Keystone failed to make the payments called for, Plaintiff Myong paid the lessor $21,200, pursuant to the guarantee he executed when the lease was executed.

Before his departure, Plaintiff Myong renamed the business Chicago Dental Instruments, Inc. to change the company's image, as the name Keystone invoked Pennsylvania, the Keystone state. Keystone later assumed this name; however, Keystone's assets were not transferred to this new entity.

Plaintiff Myong left the business in July 2002 after arguments about the relocation effort, how space at the new facility was allocated and Plaintiff Myong's discovery of an undisclosed Wells Fargo debt.

Central to the stock sale were several misrepresentations which Plaintiff Myong alleges were made with fraudulent intent, and are alleged to support a finding of nondischargeability.

Plaintiff alleges that the Defendant made three fraudulent misrepresentations: 1) that the company's inventory was worth $1,000,000.00, 2) that Keystone had gross sales of $600,000 a year over the past 2 years and 3) that not all corporate debts were listed in a sworn list of creditors that Defendant Lim executed when Plaintiff Myong purchased the stock.

On March 11, 2003, Defendant Lim and Keystone gave Plaintiff Myong a promissory note in the principal amount of $208,113 in settlement of Plaintiff's claims regarding the March 2002 stock sale. Plaintiff was to be paid monthly installments of $3468.55. Plaintiff was issued several "not sufficient funds" checks; only one valid installment payment was tendered to Plaintiff Myong.

## FIRST CLAIM FOR RELIEF

Plaintiff Myong offered inconclusive evidence as to misrepresentation number one regarding

the value of the corporation's inventory. It was insufficient to support a finding of nondischargeability. Regarding misrepresentation number two, the amount of gross sales in prior years, a corporate tax return for 2001 showed, at line 1(c), gross sales of $410,679. This proves that Defendant Lim was untruthful when he told Plaintiff Myong that gross sales were $600,000 a year during the two-year period before the stock sale. Line 2 showed that the cost of goods was $162,461. Perhaps Plaintiff is asserting that the $162,461 figure is the value of inventory. Without more, however, this does not definitely show inventory value so as to establish a misrepresentation as to number one at a particular time, or in March 2002, the relevant period of time.

The sworn list of creditors is more dispositive. It does not list 2 debts which Plaintiff discovered after the stock sale: a debt to Wells Fargo and a debt to Unicapital. Plaintiff discovered the Wells Fargo debt in March or April of 2002 while he was working at Keystone. Plaintiff made payments on this debt from his personal funds. He considered that payment a prepayment of the $350,000 balance he owed for the stock purchase. Defendant Lim did not dispute the existence of the Wells Fargo debt. He testified that he did not include it on the sworn list of creditors because he did not understand the list's contents and purpose and because the debt was made when the company's credit card was used fraudulently.

Defendant Lim testified that he knew about the Wells Fargo debt for at least 2 years before the stock sale; he said that he told the Plaintiff about this debt. The Court does not believe that an experienced business person, such as the Defendant, did not understand that the Wells Fargo debt should have been included on the sworn list of creditors. Nor does the Court believe that Plaintiff was told about it before the stock sale.

The Unicapital debt was discovered by Plaintiff after he was appointed as receiver of Keystone by the Cook County Circuit Court in August 2004. Defendant Lim explained that he thought that because that debt was for machinery that the seller reclaimed, because it was not paid for, that it need not be reported on the sworn list of creditors.

The Defendant Lim had purchased items from K & E Dry Cleaners Machinery Corp. That purchase was to be financed by Unicapital; however, the check to K & E bounced. K & E responded by taking possession of the merchandise from Keystone. Defendant Lim testified about an October 19, 2000 letter about this debt. That letter acknowledged that the merchandise had been repossessed

but sought $1550.00 for transporting it back to the seller and other costs. While the letter supported the Debtor's claim that Keystone did not have the merchandise, and Defendant's position that it consequently was not responsible for payment of the merchandise, it also shows K & E's residual claim that was not disclosed on the sworn list of creditors. Although the letter Defendant Lim testified about indicates that there was a residual claim for certain costs, he claimed at trial not to know anything about legal procedures. His understanding may be selective: he remembers and understands only that part of the situation that assists his case.

> Section 523(a)(2)(B) excepts from discharge debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by —
> (B)  use of a statement in writing
>   (i)    that is materially false;
>   (ii)   respecting the debtor's or an insider's financial condition;
>   (iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>   (iv)   that the debtor caused to be made or published with the intent to deceive;

11 U.S.C. §523(a)(2)(B).

The Court finds that the Plaintiff has established that the Defendant made false representations in connection with the March 2002 sale of Keystone Corporation stock. The tax return proves that sales in 2001 were not $600,000, as represented. The Court finds that Defendant Lim knew of the Wells Fargo and Unicapital debts but failed to disclose them. The Plaintiff testified that this information was vital to his decision to purchase the stock and that he reasonably relied on Defendant Lim's representations. The Defendant asserted variously that Plaintiff did not conduct sufficient due diligence before the sale; however, the Court finds Plaintiff's reliance on the sworn list of creditors to be reasonable. Although Debtor Lim contends that the Plaintiff did not perform a thorough investigation of the company's financial condition, it must be noted that the Seventh Circuit has held that the reasonable reliance requirement in § 523(a)(2) does not mean that a would-be creditor or borrower must conduct an investigation designed to flesh out lies. *Mayer v. Spanel Intern. Ltd.*, 51 F.3d 670, 673-76 (7th Cir. 1995). Rather, because fraud is an intentional tort, contributory negligence is not a defense, and the "reasonable reliance" element of fraud is more concerned with linking the material misrepresentation to reliance in fact and causation in fact,

thereby preventing recovery by those who know or suspect the truth. *Id.* at 675-76. It can be inferred from the circumstances that Defendant Lim published the incomplete sworn list of creditors with intent to deceive. Defendant Lim's motivation was his need for cash for the divorce settlement. Asserting that the sworn list of creditors was complete when it was not amounts to a material falsity because the creditors' list gave the prospective purchaser the impression that the Debtor's corporation had significantly less debt than it did.

Plaintiff Myong also testified that Keystone's expenses and bills were higher than Debtor Lim represented them to be. However, this problem was not addressed in the Adversary Complaint herein.

The Court enters judgment in favor of Plaintiff Yong Myong and against Defendant Kwang Ho Lim for $231,840.92, plus interest of $39,283.74 ($61.67 per diem for 637 days) and attorneys fees and costs. The Plaintiff's request for punitive damages is denied. This debt is excepted from discharge.[1]

## SECOND CLAIM FOR RELIEF

Plaintiff Myong alleges that Defendant Lim, as an officer, agent, and director of Keystone, owed to the corporation and to its shareholders duties of good faith, loyalty, obedience and diligence and that Lim's many acts in violation of 11 U.S.C. §523 (a)(4) amounted to fraud while acting in his fiduciary capacity. Relief is sought on behalf of Plaintiffs Myong and Keystone.

This count originates in the following provision:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt– . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

11 U.S.C. § 523(a)(4).

---

[1] Mr. Myong and Mr. Lim are Korean. The Court was informed that the Korean culture and traditions accord great respect to elderly persons. Mr. Lim is older than Mr. Myong. It could be offensive to doubt an older person's word. While Plaintiff Myong respects this tradition, he did not rely on it. He conducted due diligence by asking questions, inspecting Keystone before the stock sale, obtaining a written sale agreement and the sworn list of creditors. The contract of purchase required a bulk-sale affidavit, a judgment search, tax-lien searches, and UCC searches. Plaintiff Myong did not passively pursue an interest in Keystone by not questioning Defendant Lim. He acted reasonably in spite of the Korean traditions.

-5-

A "defalcation while acting in a fiduciary capacity" is distinct from "fraud . . . while acting in a fiduciary capacity." *In re Baylis*, 313 F.3d 9, 17, 20 (1st Cir. 2002). The defalcation concept means at a minimum that a breach of fiduciary duty has occurred and caused a deficiency in entrusted money or assets, *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996); *Benson v. Richardson*, 1990 WL 290144, at *39 (N.D. Iowa 1990), though not all breaches of fiduciary duty qualify as defalcations. *See generally In re Baylis*, 313 F.3d 9, 17-18, 22-23 (1st Cir. 2002); *see also infra*. The existence of a fiduciary duty running between the Plaintiff and Defendant is an inquiry that begins and ends with federal law but demands a look at state law in between, as detailed below. *See, e.g., Johnson v. Woldman*, 158 B.R. 992, 995 (N.D. Ill. 1993); *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir. 1996). The use of the word "fiduciary" in the federal bankruptcy statute is the narrower one and refers only to trusts that are express or technical. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996); *Benson v. Richardson*, 1990 WL 290144, at * 39 (N.D. Iowa 1990). While a trustee of a technical trust is the most obvious debtor subject to §523 (a)(4), the Seventh Circuit has extended its scope to a limited number of other types of fiduciary duties not involving a trust *per se*, imposing at least two requirements before a nontrustee debtor becomes a fiduciary under §523 (a)(4).

First, under the federal law embodied in § 523(a)(4), the nonbankruptcy law must impose the fiduciary obligations on the debtor/defendant for the Plaintiff's benefit in advance of and without reference to the alleged embezzlement, breach, misappropriation, or other wrongdoing causing loss of entrusted property; it cannot be primarily a special remedy arising at the time of the fraud or defalcation so that the Plaintiff will have an easier job collecting a misappropriation (a trust *ex maleficio*). *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996); *In re Marchiando*, 13 F.3d 1115-16 (7th Cir. 1994); *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000); *In re Beeber*, 239 B.R. 13, 31 (Bankr. E.D.N.Y. 1999); *Benson v. Richardson*, 1990 WL 290144, at * 39 (N.D. Iowa 1990). The alleged fraud or defalcation must have arisen out of and in the course of such a fiduciary relationship. *In re Beeber*, 239 B.R. 13, 33 (Bankr. E.D.N.Y. 1999). To both establish these preexisting fiduciary duties and to determine their nature, bankruptcy courts will normally look to state law. *E.g., Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996); *Benson v. Richardson*, 1990 WL 290144, at * 39 (N.D. Iowa

1990).

Here, we look to Illinois law. As seen below, the intertwined duties of loyalty and disclosure are not narrow obligations. In Illinois, directors of a corporation, "[w]hile not express trustees[, are] regarded, while dealing with the corporation for their own benefit, as trustees." *Winger v. Chicago City Bank & Trust Co.*, 67 N.E.2d 265, 275 (Ill. 1946) (citing *Dixmoor Golf Club v. Evans*, 325 Ill. 612, 156 N.E. 785; *Farwell v. Pyle-National Electric Headlight Co.*, 289 Ill. 157, 124 N.E. 449, 10 A.L.R. 363; *Voorhees v. Mason*, 245 Ill. 256, 91 N.E. 1056; *Ellis v. Ward*, 137 Ill. 509, 25 N.E. 530). "The relation of directors of a corporation to its stockholders, towards the corporation, and in many instances towards it creditors, is a fiduciary relationship." *Id.*; *see also In re Beeber*, 239 B.R. 13, 32 (Bankr. E.D.N.Y. 1999) (duty is to both corporation and stockholders). Corporate "directors who acquire title [of corporate property] for themselves hold it in trust for the benefit of the shareholders or policyholders." *Winger v. Chicago City Bank & Trust Co.*, 67 N.E.2d at 276. As an additional fiduciary duty, a fiduciary in active management of a business entity has an obligation to keep regular and accurate accounts and records of business transactions. *Benson v. Richardson*, 1990 WL 290144, at *39 (N.D. Iowa 1990) (citing *Couri v. Couri*, 95 Ill.2d 91, 98 (1983)); *see also Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1184-85, 1187 (9th Cir. 1996) (affirming § 523(a)(4) exception to discharge where debtors failed to account for funds invested in partnership and maintained no itemized records of daily expenditures and merchandise). Such fiduciary has a further duty to act with *uberrima fides*, or the utmost good faith and honesty, in any matter pertaining to the business entity. *Benson v. Richardson*, 1990 WL 290144, at * 39 (N.D. Iowa 1990) (quoting *Couri v. Couri*, 95 Ill.2d 91, 98 (1983)); *see also Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 & nn. 1-2 (9th Cir. 1996) (listing similar requirements of various states' partnership laws).

Having found, under nonbankruptcy law, a direct fiduciary relationship in advance of the debtor/defendant's alleged dissipation of assets, a federal court in the Seventh Circuit must then ascertain whether a second federal fiduciary requirement has been satisfied. The nature of the fiduciary relationship must be one based on an imbalance of power, control, or knowledge – not a general fiduciary relationship. For example, in Illinois, members of joint ventures and partnerships have general fiduciary duties to one another. *Johnson v. Woldman*, 158 B.R. 992,

995-96 (N.D. Ill. 1993); *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996); *Winston & Strawn v. Nosal*, 664 N.E.2d 239, 244-45 (Ill. App. Ct. 1996); *Bakalis v. Bressler*, 115 N.E.2d 323, 326 (Ill. 1953). Under § 523(a)(4), though, only a certain subset will qualify based on the facts and circumstances of the case. *See In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996); *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017-18 (7th Cir. 2000). The Plaintiff must show that a difference in knowledge, expertise, or power justified imposition of the more traditional and heightened form of fiduciary obligation, as the difference created a "position of ascendancy." *In re Marchiando*, 13 F.3d 1116 (7th Cir. 1994); *see In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996); *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017-18 (7th Cir. 2000); *cf. Benson v. Richardson*, 1990 WL 290144 (N.D. Iowa 1990) (burden of proof shifts under Iowa law if a fiduciary is sued for an accounting of trust funds and is shown to have some advantage over the defendant, including closer access to factual data). This is entirely consistent with the Seventh Circuit's frequent *dicta* indicating that general partners have a fiduciary obligation to limited partners, *e.g.*, *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996); likewise, managing partners in a partnership are said to have such special duties to other general partners and to limited partners, *see In re Marchiando*, 13 F.3d 1115-16 (7th Cir. 1994); *O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017 (7th Cir. 2000). One would reasonably expect the requisite imbalance to exist in those relationships. Illinois itself has indicated that the fiduciary duty is heightened in that instance. *Bakalis v. Bressler*, 115 N.E.2d 323, 326 (Ill. 1953) ("Since [the defendant] was the managing partner[,] the duty rested more heavily on him."). Thus, in certain cases, even a shareholder of a corporation might have a fiduciary relationship to the other shareholders based on day-to-day management authority in addition to the corporate power structure contained in the shareholder agreement. *See O'Shea v. Frain (In re Frain)*, 230 F.3d 1014, 1017-18 (7th Cir. 2000); *cf. Dowell v. Bitner*, 652 N.E.2d 1372, 1378-79 (Ill. App. Ct. 1995). The Seventh Circuit held in *In re Frain*, 230 F.3d 1014 (7th Cir. 2000) that a fiduciary relationship exists between a Chapter 7 debtor and the other shareholders in his capacity as owner of 50% of the stock of a closely held Illinois corporation for purposes of applying 11 U.S.C. § 523(a)(4). The Court held that even if Plaintiffs' access to knowledge and information was reasonably similar, where the concentration of power was substantially one-sided, the § 523 exception to discharge for breach of fiduciary

duty would lie. Additionally, in *In re Marchiando*, 13 F.3d 1111 (7th Cir. 1994), the Seventh Circuit indicated in dicta that a director owes a fiduciary duty to the corporation and its shareholders for purposes of §523(a)(4).

Finally, once the bankruptcy creditor has established the fiduciary relationship meeting these two requirements, he must at least establish circumstances constituting the debtor's "defalcation" under §523(a)(4). Defalcation, at a minimum, means that a breach of fiduciary duty has occurred and caused a deficiency in entrusted money or assets, *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996), though because not all breaches of fiduciary duty qualify as defalcations, the level of fault needed to sustain the exception to discharge has been the subject of great debate and diverging opinions. *See generally In re Baylis*, 313 F.3d 9, 17-18, 22-23 (1st Cir. 2002). In this circuit, the Plaintiff must further demonstrate that the defendant was at least reckless, not just negligent, while handling missing corporate property or other corporate opportunities. *Meyer v. Rigdon*, 36 F.3d 1375, 1383-85 (7th Cir. 1994); *cf. In re Baylis*, 313 F.3d 9, 18-20 (1st Cir. 2002) (endorsing standard very similar to "extreme recklessness" requiring "some degree of fault, closer to fraud, without the necessity of meeting a strict specific intent requirement"). This standard is consistent with the idea that "[d]efalcation is to be measured objectively," not subjectively. *In re Baylis*, 313 F.3d 9, 17 (1st Cir. 2002). In other words, the circumstances surrounding the breach of fiduciary duty themselves will indicate whether the degree of fault indicated above has been demonstrated. *In re Baylis*, 313 F.3d 9, 20-23 (1st Cir. 2002). Mere ignorance or negligence in managing assets or business affairs will not suffice, though neither are knowledge of asset wasting or intent to defraud, misappropriate, or embezzle required for the federal creditor-plaintiff to succeed. *Meyer v. Rigdon*, 36 F.3d 1375, 1383-85 (7th Cir. 1994); *In re Baylis*, 313 F.3d 9, 18-20 (1st Cir. 2002). *Contra Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996) (allowing negligent, innocent, and ignorant acts to qualify as defalcations under the Bankruptcy Code); *Benson v. Richardson*, 1990 WL 290144, at * 39 (N.D. Iowa 1990) (same).

The creditor has the burden of proof by a preponderance of the evidence, *In re Baylis*, 313 F.3d 9, 17 (1st Cir. 2002), and if the bankruptcy creditor manages to prove these three requirements by a preponderance of the evidence, then he has brought his bankruptcy claim

within the exception provided by §523(a)(4). Having established the existence of (1) a fiduciary relationship qualified in two different ways under bankruptcy law and (2) a reckless diminution of entrusted money or assets (i.e., a "defalcation"), the Plaintiff is then permitted to proceed as he would on the state-law breach-of-fiduciary-duty cause of action and, if such law permits, shift the burden of proof to the debtor-defendant to account for and to explain the loss of money, property, or corporate opportunities. *In re Niles*, 106 F.3d 1456, 1460-62 (9th Cir. 1997); *In re Storie*, 216 B.R. 283, 288 (B.A.P. 10th Cir. 1997); *cf. Matter of Thomas*, 729 F.2d 502, 505-06 (7th Cir. 1984) (finding debtors liable under § 523(a)(4), without discussing burden shifting, because debtor-defendants failed to account for and prove expenditures defraying expenses of subcontracted portion of a construction project under which they received funds deemed a trust by Wisconsin statute protecting workers and suppliers of public construction projects); *Benson v. Richardson*, 1990 WL 290144 (N.D. Iowa 1990) (burden shifts under Iowa law if a fiduciary is sued for an accounting of trust funds and is shown to have some advantage over the defendant, including closer access to factual data). In justifying a shift of the burden of proof to the defendant-debtor after the Plaintiff-creditor meets a threshold burden of proof, the *Niles* court indicated:

> Basic principles of the law of fiduciaries therefore place the burden to render an accounting on the fiduciary once the principal has shown that funds have been entrusted to the fiduciary and not paid over or otherwise accounted for. Imposing that burden is also consistent with relevant policy considerations. The evidence of what funds were received by the fiduciary and how they were applied is likely to be more accessible to the fiduciary than to the principal. *See Welsh v. United States*, 844 F.2d 1239, 1245 (6th Cir.1988) ("When ⋯ the customary approach would result in placing the burden upon a party who is not in a better position to produce the required proof, the courts have not hesitated to allocate the burden to the opposing party."). Imposing this burden also reinforces the substantive policies behind fiduciary law by ensuring that fiduciaries will perform their obligations faithfully and with care. *See generally Restatement (Second) of Trusts*, § 172 (duty to render accounts); *Restatement (Second) of Agency*, § 382 (same). Finally, this allocation of the burden of proof is consistent with policies underlying bankruptcy law. As the Court observed in *Grogan*, the Bankruptcy Code "limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' " 498 U.S. at 287, 111 S.Ct. at 659. The *Grogan* Court reasoned that it was unlikely that Congress, in fashioning the standard of proof, would have favored the interest in giving perpetrators of fraud a fresh start

> over the interest in protecting victims of fraud; here, it is similarly unlikely that Congress would have favored faithless trustees over the victims of their breaches. *Id.*

*Niles*, 106 F.3d at 1462. Illinois law does permit such burden shifting on breach-of-fiduciary-duty claims, and when it does so, it requires the defendant who is a corporate director or officer to prove, by clear and convincing evidence, how he complied with his fiduciary duty in transacting business with or utilizing the entrusted property. *Winger v. Chicago City Bank & Trust Co.*, 67 N.E.2d 265, 276, 280 (Ill. 1946); *Labovitz v. Dolan*, 545 N.E.2d 304, 310-11 (Ill. App. Ct. 1989); *Voss v. Lakefront Realty Corp.*, 365 N.E.2d 347, 357 (Ill. App. Ct. 1977).

In this case, Defendant Lim was an officer of Keystone, and, as such, he had a preexisting fiduciary duty to both the corporation and to Plaintiff Myong while he was a shareholder thereof. Here, both Plaintiff Myong and Defendant Lim had equal access to information and the power to act on the information on Keystone's behalf. For the few months Plaintiff Myong chose to manage Keystone's affairs, he executed a lease for new premises on its behalf; he and his wife ran the office, controlling expenditures; he renamed the business and allocated space at the new location. What Plaintiff complains about, for the most part, are decisions Defendant Lim made after Plaintiff Myong left the business in July 2002 shortly after the stock purchase. At that point Defendant Lim's exercise of power became one-sided. After Plaintiff Myong left his corporate position during July 2002, Lim, being the sole corporate officer, held a concentration of power that left him with an imbalance of control and knowledge and a resulting position of ascendancy; this imbalance meant that the fiduciary relationship to Keystone was one qualified under bankruptcy law and not merely a general fiduciary relationship.

Thus, when Lim drew at least 20 checks in 2003 and 2004 (Stipulated Ex. 10), making such checks payable to cash and leaving no corporate records for how such cash was utilized for the benefit of the corporation, he was potentially opening himself up to liability for dissipating corporate assets in violation of his fiduciary duty of care to the corporation and other shareholders. Because Defendant Lim personally signed these checks and consistently, over a long period of time, engaged in draining cash without any explanatory testimony or business record of the purpose, the Court finds that the pervasive behavior on Lim's part went beyond

mere carelessness or negligence. Also, the checks were written for rounded amounts, whereas checks written for specific business transactions would have ended with specific and varying dollars and cents for specific transactions. Lim was reckless in handling these corporate funds and very well may have been fully knowledgeable that he was draining the corporation of cash for unspecified purposes. The breached duties included the duties to maintain itemized business records and accounts and to exercise corporate affairs with *uberrima fides*, or the utmost good faith and honesty. Thus, the Court finds that Myong shifted the burden of proof to Lim, who, under state law, had a burden to account for and explain the checks payable to cash by clear and convincing evidence. The Debtor/Defendant Lim failed to meet this burden to account and explain the loss of corporate assets entrusted to Lim's care. The injury was primarily to Keystone, though to the extent Lim drew the checks for cash and other unexplained, nonsalary payments to himself prior to March 11, 2003, when Plaintiff Myong sold his stock back to Debtor Lim as part of the settlement agreement, the injury was also to Myong as a shareholder. *In re Beeber*, 239 B.R. 13, 34 (Bankr. E.D.N.Y. 1999) (noting "that an injury to a closely held corporation by a fifty percent owner clearly causes a direct injury to the other fifty percent owner"). If the distinction between Keystone and Myong is important in any respect, the requested accounting remedy can be used to sort out Lim's separate nondischargeable debts to each one.

    The allegations of the Second Claim and the Court's specific rulings thereon follow:

    a.    That in breach of his fiduciary duties to Plaintiff Keystone, and to the shareholders thereof, Defendant Lim has used the corporation Keystone as his own personal property, has removed funds from the said corporation to which he was not entitled and used the said funds for his own personal purposes, depriving Keystone of the use and benefit of the said funds, and the profits and avails which would be made therefrom, which were due to Keystone and the shareholders thereof;

    **Ruling:** This allegation has been proven. There was evidence that several checks made payable to Defendant Lim were not clearly in payment of business expenses. Defendant Lim denied using funds for improper purposes, however, Defendant Lim has not accounted for the expenditures; he has a duty to so account as detailed above.

b.  That in breach of his fiduciary duties to Keystone, and to the shareholders thereof, Defendant Lim has removed funds from the said corporation, and has failed to pay Keystone's debts and obligations, thus placing the creditworthiness of Keystone in jeopardy and diminishing its business and standing in the community;

**Ruling:** This allegation is too vague; for that reason the Court rules against Plaintiff as to this allegation.

c.  That in breach of his fiduciary duties to Keystone, and to the shareholders thereof, Defendant Lim has drafted checks on behalf of Keystone and from Keystone bank accounts, and has delivered the said checks to Keystone's creditors intending that the said creditors perform services, lend money and delivery [sic] product in reliance upon Defendant Lim's representations the said checks were backed by sufficient funds, that Defendant Lim knew sufficient funds did not exist in the said accounts and that upon presentment the said checks would be returned unpaid by Keystone's banks for reason of insufficient funds, that to their detriment the said creditors relied on Defendant Lim's said representations, and that the checks were returned insufficient funds. That the Cook County Sheriff's Police Department is investigating a complaint, under case report number 04-78298, against Keystone for deceptive practices due to bogus checks written by Defendant Lim from an account or accounts of Keystone; that a true and correct copy of the case memo for this investigation is attached hereto as Plaintiff Myong's Exhibit #6.

**Ruling:** The evidence established and the Court finds that Defendant Lim was responsible for Keystone issuing several NSF checks. This conduct violated the fiduciary duty of care as it subjected Keystone to criminal and civil liability. At 720 ILCS 5/17-1(d) Illinois law provides that a person commits the misdemeanor of deceptive practices when, with the intent to obtain control over property or services, they knowingly deliver a check for the payment of money, knowing that it will not be paid. Failure to have sufficient funds in an account when the check is issued is prima facie evidence that the offender knows that it will not be paid and that the offender has intent to defraud. 720 ILCS 5/17-1(a) provides for civil liability for deceptive practices conduct. Myong and Keystone must still establish in the accounting what the "defalcation" being excepted from discharge is; that is, they must still set the exact amount of missing funds or property that is a "defalcation" under § 523(a)(4).

d.  That in breach of his fiduciary duties to Keystone, and to the shareholders thereof, Defendant Lim has intermingled the assets and monies of

        Keystone with his own funds, depriving the said Keystone of the use of the said assets and the profits and avails thereof;

        **Ruling:** This allegation has not been proven. There was no evidence that Defendant Lim intermingled Keystone's assets with his own funds.

e.   That in breach of his fiduciary duties to Keystone, and to the shareholders thereof, Defendant Lim occupied the current leased commercial premises of Keystone as his sole residence and in contravention of Keystone's commercial lease for the said premises and without paying to Keystone the fair market value, or any value, for the use of the said premises as his residence;

        **Ruling:** This allegation has not been proven. There was no evidence that Defendant Lim resided on Keystone property.

f.   That in breach of his fiduciary duties to Keystone, and to the shareholders thereof, Defendant Lim has otherwise operated, managed and controlled the said Keystone to the detriment of the said Keystone and the shareholders thereof;

        **Ruling:** Plaintiff Myong has not proven that Defendant Lim generally operated, managed and controlled Keystone to the detriment of Keystone and its shareholders. In any event, Defendant Lim effectively testified that Keystone experienced higher expenses and business losses because of the lease that Plaintiff Myong executed and because a purchaser could not access Keystone at the new location due to its address being incorrectly noted in business documents.

g.   That in breach of his fiduciary duties to Keystone, and to the shareholders thereof, Defendant Lim has failed to call any meeting of shareholders of the said Keystone at least from and after March 11, 2003, and there have been no such meetings from that period of time, as have been required to be held since that time;

        **Ruling:** No "defalcation" under § 523(a)(4) was proven based on these allegations, as no reckless diminution of assets on Defendant's part has been shown.

h.   That Plaintiff Myong is informed, and upon such information and belief states the case to be, that the Defendant Lim has failed and refused to hold any meeting of the board of directors of the said corporation from and after March 11, 2003, as he is required by law to so do;

    **Ruling:** No "defalcation" under § 523(a)(4) was proven based on these allegations, as no reckless diminution of assets on Defendant's part has been shown.

i. That on or about the 24th day of May 2002, and at the special instance and request of the Defendant Lim and on behalf of Keystone Plaintiff Myong made and issued to Cole Taylor Bank, not individually but as Trustee (hereinafter "Landlord" for sake of convenience), a guarantee of lease payments due to the said trustee for commercial premises located at 435 West Addison Street, Chicago, Illinois 60641. That Defendant Keystone was to hold the present possessory interest in and to the said premises. That a true and correct copy of the said lease guaranty and agreement is attached hereto and made a part hereof as Plaintiff Myong's Exhibit #7 to this Complaint. That subsequent to the said date Keystone did hold and maintain the present possessory interest in and to the said commercial premises;

    **Ruling:** This paragraph does not accuse Defendant Lim of illegal behavior; it notes that Plaintiff Myong, at Defendant Lim's request, gave a lessor a guarantee of lease payments.

j. That unbeknownst to Plaintiff Myong, Keystone, acting under the direction and control of Defendant Lim, failed to make timely payments to Landlord under the aforesaid lease;

    **Ruling:** The Plaintiff's proof fails to establish this allegation. Plaintiff has not proven that Keystone had sufficient funds to make the lease payments. In any event, failure to pay a debt, per se, does not amount to breach of fiduciary duty.

k. That on the 13th day of October, 2003, and unbeknownst to Plaintiff Myong, Keystone, acting under the direction and control of Defendant Lim, executed an agreement with the aforesaid Landlord under which Keystone was to make payments totaling $21,200.00 and under which Plaintiff Myong was named by Defendant Lim as a party. That a true and correct copy of the said agreement is attached hereto and made a part hereof as Plaintiff Myong's Exhibit # 8 to this Complaint;

    **Ruling:** Plaintiff has not shown that Defendant Lim acted without authority when, on behalf of Keystone, he agreed to pay the lessor $21,200.00. Plaintiff Myong had access to information regarding the lease which he arranged on behalf of the business.

l.    That Keystone, acting under the direction and control of Defendant Lim, failed to make any payments to Landlord as required by the aforesaid agreement;

**Ruling:** The Plaintiff's proof fails to establish this allegation. To find that the failure to pay according to the agreement violated a fiduciary duty, Plaintiff must prove that Keystone had sufficient funds to make the payments required by the agreement.

m.    That no part of the $21,200.00 required to be paid under the aforesaid agreement was made by Keystone, which was acting under the direction and control of Defendant Lim, and the said Landlord demanded payment of the said sum from, *inter alia*, the Plaintiff Myong;

**Ruling:** This paragraph does not accuse Defendant Lim of illegal conduct; it notes that certain payments were not made and that the lessor demanded payments from the Plaintiff, who had guaranteed payment of this expense.

n.    That in January 2004 Plaintiff Myong in fact made payments totaling $21,200.00 on behalf of Keystone and to Landlord, and thereby has become subrogated to the interests of the said Landlord;

**Ruling:** This paragraph does not accuse Defendant Lim of illegal conduct; it notes that Plaintiff paid the lessor $21,200.00.

o.    That Plaintiff Myong has demanded payment of said $21,200.00 from Defendant Lim but no part of the said sum has been paid;

**Ruling:** This paragraph does not specifically accuse Defendant Lim of illegal conduct; it notes that Plaintiff has demanded payment of $21,200.00 from Defendant and that no part of said sum has been paid by the Defendant.

p.    That on or about March 11, 2003 the Defendant Lim and Keystone, acting under the direction and control of Defendant Lim, and each of the two, issued and delivered to the Plaintiff Myong, a promissory note in a principal amount of $208,113.00, which note was and is payable in monthly installments of $3,468.55, the monthly due dates for which commenced in July, 2003. That true and correct copies of the said note and security agreement are attached hereto and made a part hereof as Plaintiff Myong's Exhibits #'s 9 and 10, respectively, to this Complaint;

**Ruling:** This paragraph does not accuse Defendant Lim of illegal conduct;

it notes a March, 2003 agreement between Plaintiff, Defendant and Keystone which requires payment of $208,113.00 to Plaintiff in monthly installments of $3,468.55.

q.  That the Defendant Lim immediately breached the aforesaid note and agreement, and remains in breach thereof, to wit: That only one installment payment of $3,468.55 was made on the said note and thereafter Defendant Lim delivered to Plaintiff Myong bogus checks with insufficient funds in the underlying accounts and failed to make any subsequent payments on the said note;

**Ruling:** No "defalcation" under § 523(a)(4) was proven based on these allegations, as no reckless diminution of corporate assets on Defendant's part has been shown.

r.  That Plaintiff Myong has demanded payments on the aforesaid note, but the Defendant Lim has failed and refused to make such payments and is in default on the said note. That by reason of the default of Defendant Lim to make payments on the said note Plaintiff Myong has accelerated the entire amount due under the said note;

**Ruling:** A default alone does not amount to breach of fiduciary duty. See ruling on paragraph (q).

s.  That as of October 15, 2004, and by reason of Defendant Lim's aforesaid breach of agreement, Plaintiff Myong has suffered damages in the amount of $231,840.92, being principal of $208,113.00 less one payment of $3,468.55 plus interest of $27,196.47. That per diem interest on the said debt accrues at the rate of $61.67;

**Ruling:** The Plaintiff has proven in Count I that he has suffered damages of $231,840.92 and that interest accrues at the rate of $61.67 a day.

t.  That by reason of the terms and conditions set forth in the aforesaid note the Plaintiff Myong is entitled to recover of and from the Defendant Lim his reasonable attorney's fees and the costs of collection of the said note;

**Ruling:** As allowed by the March 2003 note and contract, the Plaintiff may recover reasonable attorney's fees and costs of collection and is hereby granted leave to do so for the prosecution of this Complaint.

u.  That on June 24, 2004 the Circuit Court of DuPage County entered an order of eviction against Keystone entitling York Industrial Center, Inc.,

the landlord of Keystone's leased premises in Bensenville, Illinois to immediate possession of the said leased premises and to damages of $5,620.00. That a copy of the said order is attached hereto and made a part hereof as Plaintiff Myong's Exhibit #11. That Defendant Lim failed to notify and apprise Keystone's shareholders, including Plaintiff Myong, of the said order and failed to timely notify and apprise Keystone's shareholders, including Plaintiff Myong, of the underlying lawsuit. That on August 10, 2004 Defendant Lim notified Plaintiff Myong for the first time that there was a lawsuit between Keystone and the aforesaid landlord but also that Keystone had reached a deal with the said landlord. That this statement regarding a deal with the landlord was false and was known by Defendant Lim to be false at the time it was made;

**Ruling:** As to these allegations, the Plaintiff has failed to establish any nondischargeable liabilities under § 523(a)(4) because even if these failures to notify were breaches of fiduciary duty under state law, the plaintiff has not shown how they qualify as defalcations under the federal statute (see discussion *supra*) or as fraud. The Plaintiff failed to establish that Lim knowingly made a false statement pertaining to the above allegations. Finally, to the extent the above allegations involve a failure to notify Plaintiff Myong, the Plaintiff failed to prove nondischargeability as a result of the fact that Plaintiff Myong was, in June 2004, apparently no longer a shareholder towards whom Defendant Lim owed a fiduciary duty. As of the March 2003 settlement agreement, Plaintiff Myong was no longer a shareholder.

v.  That on August 10, 2004 Defendant Lim notified Plaintiff Myong that he was resigning from Keystone effective after August 31, 2004.

   **Ruling:** This paragraph does not allege that Defendant Lim did anything illegal; it notes Defendant's August 10, 2004, resignation.

w.  That on August 18, 2004 Defendant Lim states again to Plaintiff Myong that the lawsuit between Keystone and York Industrial Center, Inc., had been resolved. That this statement was false and was known by Defendant Lim to be false at the time it was made. That it was only after being appointed receiver of the assets of Keystone as aforesaid, that Plaintiff Myong, acting in his capacity as receiver *pendente lite*, discovered the aforesaid order, thereby necessitating that Plaintiff Myong, acting in his capacity as receiver *pendente lite*, undertake emergency action to safeguard the assets of Keystone by moving them into storage; that Plaintiff Myong, acting in the said capacity, did perform the said emergency action;

**Ruling:** Plaintiff has not proven that such statements were made to him on August 18, 2004 and that Defendant knew the statements to be false. The paragraph notes Plaintiff's conduct in response to discovery of the DuPage County litigation.

x.  That by the effective date of the Defendant Lim's resignation from Keystone, i.e. by September 1, 2004, Defendant Lim had caused the bank and credit accounts of Keystone to be in an overdrawn and overlimit status, respectively, the utility accounts of Keystone to be past due, and the electricity service in Keystone's leased premises to be disconnected for failure to make payments therefor. That Defendant Lim failed to notify and apprise Keystone's shareholders, including Plaintiff Myong, of the said status of Keystone's bank, credit and utility accounts. That it was only after the said effective date of Defendant Lim's resignation and after being appointed by the Circuit Court of Cook County as receiver of the assets of Keystone *pendente lite* that Plaintiff Myong, acting in his capacity as receiver *pendente lite*, discovered the foregoing status of the said accounts.

**Ruling:** As to these allegations, the Plaintiff has failed to establish any nondischargeable liabilities under § 523(a)(4) because even if these failures to notify were breaches of fiduciary duty under state law, the plaintiff has not shown how they qualify as defalcations under the federal statute (see discussion *supra* pages 9-10) or as fraud. To the extent the above allegations involve a failure to notify Plaintiff Myong, the Plaintiff failed to prove nondischargeability as a result of the fact that Plaintiff Myong was, in September 2004, apparently no longer a shareholder towards whom Defendant Lim owed a fiduciary duty. As of the March 2003 settlement agreement, Plaintiff Myong was no longer a shareholder.

To the extent these allegations relate to the fact that Lim engaged in large expenditures of cash, leaving no business records revealing a business purpose, the Court has previously deemed the related liabilities to be nondischargeable defalcations.

This opinion constitutes findings of fact and conclusions of law under Bankruptcy Rule 7052. A separate judgment order consistent with the opinion will be entered under Bankruptcy Rule 9021.

Dated: July 26, 2006

ENTERED:
J.P.Cox
Jacqueline P. Cox
United States Bankruptcy Judge